AUDITOR GENERAL *v.* BOARD OF SUPERVISORS OF BAY
                                    COUNTY.

1. TAXES—ACCOUNTING BETWEEN STATE AND COUNTY—MANDAMUS
   —SET-OFF.
       In *mandamus* proceedings by the auditor general to compel a
          county to collect and pay to the State the amount of an
          alleged indebtedness, the county cannot set off moneys that it
          had previously paid to the State in excess of the amount
          legally demandable.

2. SAME—CONTESTING VALIDITY OF CHARGES.
       Where the petition in such case states the account between the
          State and the county from a specified date, the county may
          contest the validity of any of the items embraced within the
          account, although a balance shown to be due to the State at a
          subsequent date was paid by the county.

3. COUNTIES—EXCESSIVE APPORTIONMENT OF STATE TAX—REMEDY.
       A county which has collected the State tax apportioned to it
          cannot refuse to pay over any part of the same on the ground
          that the apportionment included territory that had been
          detached and organized into another county, but it must look
          to the new county for reimbursement.

4. ACCOUNTING BETWEEN STATE AND COUNTY—INTEREST ON STATE
   TAX
       Section 43 of the tax laws of 1882, 1885, and 1891, respectively,
          authorized the town treasurer to retain from the State and
          county taxes collected by him a sum sufficient to fill any defici-
          ency in the school fund, and required the county treasurer to
          retain the amount thus reserved out of the first moneys received
          from township taxes.  *Held*, that interest on State taxes so
          withheld was properly chargeable to the county, under the
          provisions of the several laws for the adjustment of accounts
          between the State, county, and township by mutual charges
          of interest.

5. SAME—COLLECTION FEES.
       Under section 74 of the tax law of 1889 (No. 195), providing that
          a collection fee of 4 per cent. should be added to all taxes
          returned to the county treasurer, and that when paid to him
          it should belong to the general fund of the county, and, when
          paid to the auditor general, to the general fund of the State,

such fee, when realized by sale or redemption at the county treasurer's office, belonged to the county, rather than to the State.

6. SAME—TAX LAW OF 1889—CLEARANCE SALE OF STATE TAX LANDS—CONSTITUTIONAL LAW.

While, under the tax law of 1869, as between State and county, the latter was entitled to credit for all taxes returned as delinquent, the county, by the terms of section 124, became a guarantor of their ultimate collection; and since 1882, pursuant to existing tax laws, the county has received credit for the delinquent State tax only, and lands bid in to the State are held "for the use of the State, county, and town, in proportion to taxes, interest, and charges due each." Section 71 of the tax law of 1889, providing for the sale of lands bid off in the name of the State for taxes assessed in previous years, at a minimum bid of 25 per cent. of the amount due thereon, the loss to be borne by the several taxes *pro rata*, was valid, therefore, as to lands bid off to the State for taxes assessed subsequent to 1869, and the county was properly chargeable with its proportion of the resulting loss.

7. SAME—SUFFICIENCY OF TITLE TO ACT.

The title to the tax law of 1889, *i. e.*, "An act to provide for the assessment of property and the levy of taxes thereon, and for the collection of taxes heretofore or hereafter levied," was sufficiently comprehensive to include the provisions of section 71, authorizing a clearance sale of State tax lands.

8. TAX LAW OF 1885—VOID SALE—REFUNDING.

The tax law of 1885 (No. 153) was prospective only in its operation, and sales thereunder for delinquent taxes assessed under the law of 1882 were void, and could not be validated by subsequent legislation. Where the title to land conveyed by virtue of such a sale was declared void, however, the auditor general was justified under section 104 of the act, on presentation of a certificate from the trial judge, in refunding to the purchaser the amount paid, although neither the State nor the county was a party to such suit.

9. SAME—AMOUNT CHARGEABLE TO COUNTY.

In such case, the county is chargeable with the amount of the county and township taxes, under the provision of said section that, "if the error originated with the township or county officers, the proper amount shall be charged back to the county."

10. CONSTITUTIONAL LAW—PAY OF STATE TROOPS—TITLE OF ACT.

Act No. 169, Pub. Acts 1885, entitled "An act to amend * * * section No. 915 of Howell's Statutes, relative to the compensa-

tion of State troops," which authorizes the auditor general to allow the bills of the militia for services rendered in aid of the civil authorities, and to charge to the proper county the amount paid thereon, is not unconstitutional on the ground that the object of the act is not expressed in its title.

11. SAME—CLAIMS AGAINST COUNTY.

Said act is not repugnant to article 10, § 10, of the Constitution, providing that the board of supervisors shall have the exclusive power to prescribe and fix the compensation for all services rendered for and to adjust all claims against the county. The service of the militia is the service of the State, and their compensation a claim against the State; and the latter has the right to have a portion of the public revenue applied to the discharge of its obligation.

*Mandamus* by Stanley W. Turner, Auditor General, against the board of supervisors of Bay county and William V. Prybeski, county treasurer, to compel respondents to collect and pay to the State an amount alleged to be due to the State from the county. Submitted June 25, 1895. Writ granted October 10, 1895.

*Fred A. Maynard*, Attorney General, and *A. A. Ellis*, for relator.

*Isaac A. Gilbert*, Prosecuting Attorney (*McDonell & Hall, Lee E. Joslyn*, and *U. R. Loranger*, of counsel), for respondents.

HOOKER, J.    The relator seeks to compel the officers of Bay county to collect and pay to the State upwards of $100,000, which he claims to be due to the State from said county.    He professes to claim only sums which have been collected by said county since December 31, 1884, alleging that at that date said county had overpaid the State, and that the State soon after paid to said county the sum of $95, in full of the balance due to the county.    The county admits this payment, but alleges that at the time it was made the State was indebted to the county for a large amount, which it had paid, and the State received, under the mistaken belief that it was a valid obligation against the county, and it asks that this

sum be allowed in reduction of relator's claim. Apparently the county had paid all claims made by the State up to December 31, 1884, and something more, and it asks that the correct amount be ascertained, and allowed against the relator's claim. In other words, the county desires that the account between itself and the State from 1869 to the date of filing the petition be examined, and a balance struck, disregarding the fact that on December 31, 1884, a sum was paid by the State as a balance due upon account. It denies that there was a settlement at that time, and questions the authority of the county treasurer to make a valid settlement.

Whatever may be thought about the power of the treasurer to settle, or of the effect of his acceptance of the $95, it is plain that the State received the funds from the county; and, if it received more than it was entitled to, the most that can be said is that the county had a meritorious claim against the State for the excess, and this we are asked to enforce against the State in this proceeding. If this is a just claim upon the part of the county, it can amount to no more than a claim against the State for money paid to the use and benefit of the county, which, it has been repeatedly held, cannot be made the subject of an action against the State, as a State cannot be sued without its consent. The case of *Ambler* v. *Auditor General,* 38 Mich. 746, is in point, and closely resembles the present case, except that here the proceeding was instituted by the auditor general, while in that case he was respondent in a *mandamus* proceeding, upon relation of the county treasurer. But in that case, like this, the amount in controversy was money paid to the State treasurer under a mutual mistake of law, and the court denied relief, expressing doubt of the propriety of interference with matters of a purely public and executive nature, where the auditor's action is not purely mechanical.

"While there is, no doubt, some difficulty in drawing with precision any exact line of jurisdiction, we think it

very clear that, *where money has gone into the State treasury, not as a separate and independent item wrongfully received, but as part of a general balance rightfully received*, the recovery of it from the State, if not voluntarily allowed within the authority of some proper officer, must fall within the same rules that would apply to any other pecuniary demands against the State. If this money had been found in a city or county treasury among the book balances or other charges or credits, or if it had been retained by an individual upon an error in stating accounts, it could not be distinguished from other causes of action usually prosecuted in a suit for money had and received. It is simply so much money kept back out of the collections made by the State for the benefit of the county. If the State could be sued, it would certainly not be a proper case for *mandamus*. The fact that actions will not lie against the State does not change the nature of the claim, or make it anything but a State debt."

This subject was again before the court in the case of *Auditor General* v. *Van Tassel*, 73 Mich. 29. Mr. Justice Campbell reviewed the case of *Ambler* v. *Auditor General*, emphasizing the rule there stated. In the case of *Auditor General* v. *Board of Supervisors of Shiawassee Co.*, 74 Mich. 537, Mr. Justice Long reaffirms the doctrine, and distinguishes between cases where the illegal charge is made the subject of proceedings on behalf of the State to collect and those where it is sought to be introduced as a set-off or counterclaim, the same having been already paid to the State. The doctrine was recognized in the case of *Auditor General* v. *Board of Supervisors of Midland Co.*, 84 Mich. 121, but was held not applicable to the facts in that case. We must therefore hold that claims on behalf of the county which arose before December 31, 1884, cannot be considered.

The county may, however, question the validity or amount of any item of the relator's claim, and several important questions arise in relation to the charges made against the county since December 31, 1884. Since that date the account has been running, balances having been

struck by relator from time to time; but the balance against the county has varied, and, as a rule, has steadily increased. It is said on relator's behalf that on December 24, 1886, the county paid in cash the balance due the State, as shown by a quarterly statement rendered September 30, 1886, and it is urged that this precludes inquiry back of that date; but the petition contains a statement of account, starting, as already said, in 1885, and showing annual balances carried forward. Relator's claim is based upon the theory of an open, unsettled account from that date. There is, therefore, force in the claim that none of these items has been paid, so as to preclude the respondents from questioning its validity.

Inasmuch as the respondents' right to contest is limited to the claims presented, it is unnecessary to investigate items back of January 1, 1885. This eliminates several questions argued at length in the briefs.

The practice in the auditor general's office was to charge to each county the State taxes assessed. The county was credited with such cash as was paid upon such taxes, and by the amount of State taxes in the delinquent list. Later it was charged with such sums as the county treasurer reported collected by him upon such lists, and he was credited with payments upon such collections when made. In addition to this account, a general account was kept with the county, in which other items were charged and credited; e. g., for the year 1885, the treasurer was charged on December 31st with interest on balances and on taxes charged back, an item for cash paid for deaf and dumb, amounts paid for State troops in aid of civil authorities, delinquent taxes refunded, and items of cash paid by the State on collections made by it, and cash received by the county treasurer on redemptions of State tax lands. The county was credited with items of cash collected by the State. Of all these items none go back of December 31, 1884. Each account shows a balance due the State, and such balances are carried forward in their respective accounts, and constitute

the first items for the succeeding years, and there has never been a time, so far as the petition shows, when there was not such a balance at the end of the year.

### Arenac County Taxes.

Among the questions raised by respondents is one that affects the amount of taxes apportioned to Bay county. In the year 1883 the legislature detached a portion of the territory within the county of Bay, and organized the county of Arenac. When the State tax was apportioned, the auditor general apportioned it upon the valuation of Bay county as shown by a former equalization by the State board, which included all of the territory formerly within the county of Bay. The effect of this was to impose upon Bay county the State taxes properly belonging to, and which should have been apportioned to, Arenac county. Correspondence was had about the matter, and the auditor general asserted that the course taken was the proper one; that Bay county should assess and collect the tax, and adjust the matter with the county of Arenac. The board of supervisors of Bay county thereupon apportioned the State tax, and it was collected. It is now contended that the apportionment was illegal to that extent, and that the amount is not a valid charge against the county. It cannot be denied that the apportionment to the county of Bay was excessive, but it is difficult to distinguish between this excess and one arising in any other manner. Apportionments of State and county taxes are often incorrect and excessive as to one or another locality, and, while the proper officers might be justified in not assessing or collecting such excess, it is not so clear that they may refuse to pay it over after it has been collected. Township and county treasurers receive the State tax as agents of the State. As said in the case of *Auditor General* v. *Van Tassel,* 73 Mich. 33:

"The supervisors have no more control over the money in his hands than if it were in the State treasury. It is

a distinct trust fund, and can no more be stopped there, and devoted to county purposes, than it could be attached or garnished for the county, or for any one to whom the county is indebted. There is no point of view in which this money can be allowed to be impounded or retained in his hands which does not involve every element of a suit against the State. It would be a very dangerous doctrine to allow the revenues of the public to be tampered with while in process of realization. If such considerations can prevail in any case, they must prevail in all cases where the treasurer should see fit to set them up. A defense which can be lawfully made cannot be disposed of until the final hearing, and the final hearing must await the determination of issues of fact, and the lapse of time required to dispose of them in the usual course of trial. The State would soon become bankrupt if any county officer can, at his will, raise questions concerning the balance of accounts, and keep the money till they are settled."

We think, therefore, that the respondents must be left to their legal remedies against the county of Arenac, if they have not already been reimbursed. *Board of Supervisors of Ontonagon Co.* v. *Board of Supervisors of Gogebic Co.*, 74 Mich. 724.

### Interest on State Taxes Retained by Townships.

The relator's account contains annual charges for interest on balances. It is claimed by respondents that these are excessive. Most of the charges alleged to be incorrect are covered by what has been said in relation to matters of set-off. Respondents assert that these items include amounts for interest upon State taxes collected by the township treasurers, and withheld to make good temporary deficiencies in the school fund. These items are said to have covered the years between 1885 and 1893. The authority for the course pursued by the township is found in the tax law of 1882 (section 43, Act No. 9), which provides as follows:

"Within one week after the time specified in his warrant, the town treasurer shall pay to the county treasurer

all State and county taxes collected, except that from the State and county taxes collected he may retain a sum sufficient to fill any deficiency in the sum collected for school purposes, but the amount so retained shall not exceed the total delinquent school taxes returned, and the county treasurer shall retain the amounts thus reserved out of the first moneys received by him from any township taxes."

This provision was retained in the tax laws of 1885 and 1891. The amounts withheld were large, running from $9,000 to $25,000. Respondents assert, but it does not seem to be an established fact, that the average time that interest was charged was one year. Nor is there tangible evidence before us from which we can determine the amount of such interest included in the relator's claim. It is apparently conceded, however, that the account embraces a greater or less amount arising from this source. Respondents maintain that the county should not be required to pay interest upon money not received, while relator's contention is that it must pay over all State taxes collected, reimbursing itself from collections of township taxes made by the county treasurer, as contemplated by section 43, quoted above.

The scheme of taxation in this State involves the opportunity to pay all general taxes in the township, and accounting between the township and county treasurers, and in turn between the county and State offices. The law prescribes the time for payment of county taxes to the county treasurer and of State taxes to the State treasurer, and section 71 of the tax law of 1882 provides for the adjustment of accounts between the several offices by mutual charges of interest. If the township collected and withheld State money, the State should have interest upon it, which, from the methods of doing business as prescribed by law, it could only receive from the county. If the treasurer of Bay county did not receive these taxes at the proper time, the county should have charged, and perhaps did charge and collect, inter-

est from the township; and, if not, its failure to do so cannot affect the State. We think, therefore, that interest was lawfully charged upon such items.

### Collection Fees.

Section 31 of Act No. 195, Pub. Acts 1889, provides for the collection of 4 per cent. collection fees, if the tax be paid after January 1st. Section 74 provides that a collection fee of 4 per cent. shall be added to all taxes returned to the county treasurer, and that when paid to the county treasurer it shall belong to the general fund of the county, and when paid to the auditor general it shall belong to the general fund of the State. Section 52 provides for the commencement of proceedings to enforce collection by the auditor general, in the name of the State, of the taxes, interest, and charges, including a collection fee of 4 per cent. Under these, sales are made by the county treasurer to the person who will pay the tax, interest, charges, etc., for the smallest undivided fee-simple interest in the land taxed (see section 62), and for want of bidders the land is bid in for the State. Subsequently the land may be redeemed at the office of either the auditor general or county treasurer. Relator claims that upon such sale or redemption the collection fee belongs to the State, wherever made, and he has accordingly charged it to the county. We think this was not intended. The addition of the 4 per cent. fee is at all places charged as a collection fee. One per cent. is charged from the first. Upon the failure of the person taxed to pay voluntarily, an additional charge of 3 per cent. is made, and this charge of 4 per cent. is not lost sight of after, but is a part of the amount whenever and by whomsoever the tax is collected. No part of it is paid to State or county upon collections made by the township treasurer. Section 74 expressly provides that it shall go to the county or State as the one or the other office may receive it before sale, thus indicating that it is

a collection charge, rather than a penalty intended to reimburse the State for the expense of its advertising and other expenses of sale.   We think, therefore, that it should be governed by section 74, and, when the money is realized by sale or redemption at the office of the county treasurer, it should belong to the county; and therefore that such item with the interest, amounting—as we understand it to be conceded—to the sum of $2,505.29, should be deducted from the relator's claim.

### Loss on Sale of Lands Bid to the State.

The tax law of 1889 (section 71) provided that lands bid off in the name of the State for taxes assessed in previous years should be sold at the time of the annual tax sales. Accordingly such sales were made in Bay county, and they resulted in a loss, a fraction only of the amount charged being realized.   The act authorized such sales upon a bid of 25 per cent. of the amount due, the loss to be borne by each tax as classified *pro rata*.   It is now claimed that this sale was unauthorized, upon the ground that the legislature had not the power to require such sale, resulting in loss to the county.   The county is not asked to respond to the State for a loss to the State, but the county asks the State to make good its loss upon local taxes.   If it has any right to compensation, it is because the State was its debtor upon the sale of such lands to the State.

Several cases are cited to sustain the proposition that the counties are not liable for losses arising from sales of land bid in to the State.   The question arose under the law of 1869 (section 124), which provided for the sale of such lands remaining unsold at the expiration of five years from the time that they were bid off to the State, and that the county should be credited with gains and charged with losses arising from such sales.   No limitation was placed on the amount for which such lands might be sold, except that it be to the highest bidder.   In

the case of *Auditor General* v. *Supervisors of Monroe Co.*, 36 Mich. 71, it was held that, under the law existing previous to 1869, the State only was interested in lands returned delinquent, that the amount due upon such lands was applicable in discharge of the county's liability to the State, and that losses upon sales of lands bid in to the State must be borne by the State, and that the provisions of section 124 of the law of 1869 could not be treated as retrospective, but prospective only.    Under that decision all taxes returned delinquent were charged to and became the property of the State, and, while it was intimated that, as a matter of future policy, section 124 "might fairly be considered as a means of ultimate collection, by making a county a guarantor, not only of the validity of the taxes, but also of the marketable value of the security," it was not determined whether the law was valid or invalid.    It was only held that it could not apply to taxes levied under previously existing laws. This decision has been followed in several cases arising upon taxes assessed previous to 1869.    *Auditor General* v. *Board of Supervisors of Saginaw Co.*, 62 Mich. 589, 597; *Auditor General* v. *Board of Supervisors of Shiawassee Co.*, 74 Mich. 547; *Auditor General* v. *Board of Supervisors of Ottawa Co.*, 76 Mich. 297; *Auditor General* v. *Board of Supervisors of Midland Co.*, 84 Mich. 126. In each of these cases the items complained of by the respective counties arose under laws existing prior to 1869.    We understand that not to be so in the case before us.

The law of 1869 seems to have followed previous laws so far as to make the delinquent list a county credit. Section 68 provides that the amount thereof "shall be placed to the credit of the proper county," etc.    Section 87 also provides that lands not sold to private bidders, etc., shall be "bid off for the State."    But section 124 expressly provides that lands bid in to the State shall be sold subject to the same conditions and restrictions in

other respects as are now, or may hereafter be, provided by law in regard to other State tax lands, and that losses shall be charged to the county. As intimated in *Auditor General* v. *Supervisors of Monroe Co.*, this provision, if valid, makes the county a guarantor of the value of the land to the extent of the tax and charges, and this the legislature might lawfully do.

The case of *Auditor General* v *Supervisors of Monroe Co.* was decided in April, 1877, and the tax law passed in 1882 appears to have been made with this decision in view, for it differs in important particulars from previous laws. By section 49 it was made the duty of the county treasurer to make and forward to the auditor general a transcript of the delinquent list; but the important provision of section 68 of the law of 1869, that "when received by the auditor general, the amount thereof shall be placed to the credit of the proper county," is omitted. The law changed the method of procedure in relation to sales for delinquent taxes, introducing the present practice of a petition and decree in chancery as a foundation for the sale. Section 63 contains a significant change, providing that, where the lands cannot be sold to other bidders, the treasurer shall bid off the same, not for the State or to the State, but "in the name of the State, for the *use of the State, county, and town, in proportion to taxes, interest, and charges due each.*" We have no doubt that the changes made by the law of 1882 were intended to change the law of 1869 in an important particular. Under that law the county was a guarantor. Under that of 1882 the State bid off the lands for the benefit of the county and town, as well as itself. It is apparent that the State was not to accept delinquent local taxes of county and town upon the claim for State dues. It undertook their collection with its own, and was to account for them when collected. Whatever may have been the practice before 1882, since that time only the delinquent State taxes have been credited to the counties, and we

think that such practice was warranted by each of these laws discussed.

Section 71 of the act of 1889 is attacked as unconstitutional, but we think otherwise.    In our opinion, the title of the act was broad enough to cover this, which was but a provision for the collection of taxes still unpaid, and, as already shown, the laws under which these taxes must have been assessed omit the provisions which impose upon the State the burden of losses upon local taxes. We think, therefore, that these losses on State tax lands were chargeable to the county.

### The Briggs Tax Title.

In October, 1885, and 1886, Eben N. Briggs purchased land at tax sales held under the provisions of the law of 1885 for taxes assessed under the law of 1882.    These sales were admittedly void, and Briggs acquired no title by the deeds which the auditor general subsequently executed and delivered to him.    An action of ejectment was commenced by Briggs to recover possession of the lands.    The facts were stipulated, and he was defeated. Upon presentation of a certificate from the circuit judge, as provided for by section 104 of Act No. 153 of the Laws of 1885, the money was refunded to Briggs by the auditor general, and the amount charged to the county.    It is now contended that the act of 1885 was prospective merely, and did not authorize the auditor general to refund these taxes, and that, if it did, the error was not that of a local officer, and that the amount could not be legally charged to the county, under the provisions of section 104.

The court has held the act of 1885 prospective merely, and applicable only to taxes thereafter to be assessed. Hence there was no authority to sell under this law, and the attempted sale is void.    The sale was made by the direction of the auditor general, and was the result of a mutual mistake of law on the part of himself and the

county treasurer, by means of which State, county, and township realized a tax which has since been paid back by the State. It is said that the law of 1885 cannot apply, because it was prospective in its operation merely. The sale was, as a matter of fact, made under the law of 1885, and could have been made under no other, for there was no other then in existence. It turned out that this sale was void, because the tax in question could not be thus collected. The law did not warrant the sale. The same would be true if there had been no apportionment or equalization. It has been held in several cases that the act of 1885 was prospective only in its operation, and that sales for delinquent taxes, assessed under the law of 1882, were void, and no title was acquired under the purchases at such sales. It was further said that such sales could not be made valid, and that until the legislature should provide a means for enforcing the lien of such taxes they could not be collected by process of law. But in this case they were collected, by a sale made by the county treasurer, in accordance with the provisions of the law of 1885, notwithstanding the fact that such law had no legal application. This was the result of a mutual mistake of law upon the part of the auditor general and the county treasurer, and State, county, and township profited thereby, each realizing the amount of its tax upon the premises. It is admitted that, as a general rule, the purchaser at a tax sale buys at his peril, and that he cannot have his money refunded except in accordance with an express provision of law permitting it, and that there is no such provision, unless the act of 1885 applies to this sale. If it can be said that such provision does not apply to sales made before the act took effect,—a question not before us,—it does not necessarily follow that sales made afterwards are on the same footing. The former, when made, were based upon other existing statutes. This sale had no such foundation. A valid lien existed, but the means of legally enforcing it had been taken away. A new procedure was supposed

to have been provided, and under this a void sale was made. Wherein was such sale different from any other void sale that might subsequently be made under the law of 1885 for an invalid tax levied under that act? Both sales would be without foundation, both made under the mistaken belief that they might lawfully be made under such law. The only difference appears to be that when the tax in question was assessed a different procedure existed, which was abolished before the State was able to enforce its lien, which then existed and still exists. If the State had not the power to change such method, there would be more force in the contention. But it had such power. Proceeding under this law, money was obtained at a sale, without warrant. By its express terms such moneys might be refunded, and we think that Briggs had a just claim, which the auditor general might lawfully pay upon presentation of a proper certificate.

It is contended that the certificate was void, because neither the State nor county was a party to the ejectment suit. The State is the source of power; counties and townships being agencies of government, upon which certain duties in the way of collecting and disbursing the revenue are imposed. We have no doubt that the refunding of taxes might be committed to the judgment of the auditor general, as is the rejection of lands from the delinquent lists, where, in his judgment, they are wrongly assessed, or he is satisfied of previous payment. In neither of these cases is the county or township represented. The State deals with its own, and neither the county nor the township can be heard to complain that it had no hearing. So here the law points out what shall be evidence justifying a refunding of the purchase price and cancellation of the deeds, which is no new practice. We think that the auditor general acted upon sufficient evidence, and was justified by section 104 of the law of 1885 in the cancellation of these deeds and in refunding the tax to Briggs.

It remains to inquire whether he could lawfully charge

it to the county. Two sections of the act are thought to bear upon this question,—81 and 104. Section 81 provides that losses sustained by the default of any officer shall be charged to the municipality which he represents,—*i. e.*, township, county, or State, as the case may be. Section 104, after the provision for refunding, contains the following language, viz.: "If the error originated with the township or county officers, the proper amount shall be charged back to the county." In one sense this error originated with the auditor general, for he directed the sale, and caused publications of the list. On the other hand, this was harmless, had not the treasurer made the sale, and received the money therefor, which presumably has been accounted for to the State, county, and township. As already said, the lien still exists, when the State shall see fit to enforce it. Until it does, neither State, county, nor township has a right to the money. Equitably the State should stand its share of this sum, and county and township should contribute to reimburse the State for the balance paid. If this were an incurable error, by which, through the default of one or another officer, the tax was irretrievably lost, it would fall within section 81; but it is not. In fact, it can hardly be called a default, in such a sense. By unlawful zeal of both State and county officers, instead of an omission, the State, county, and town have obtained something to which they were not entitled. Under such circumstances we think section 104 applies, and the county should be charged with all but the State tax, which should be deducted from relator's claim; the county and township taxes being, under such circumstances, the "proper amount" to be "charged back to the county." Section 104, Act No. 153, Pub. Acts 1885.

### *Expenses of State Troops.*

But one question remains. In July, 1885, upon requisition of the sheriff, the governor sent a portion of the State militia to aid the civil authorities in preserving

the peace in Bay county. The auditor general, acting under Act No. 169 of the Laws of 1885, audited the bills of said militia, and drew his warrant for the same upon the State treasurer, and charged the amount to the county. A question was raised over the validity of the governor's action, it being claimed that the troops were sent without any requisition from a proper officer of the county, but this claim we understand to be abandoned. It is contended that the charge is invalid for the reason that the act is unconstitutional (1) because it permits the auditor general to allow claims against counties without an opportunity to the board of supervisors of being heard; (2) because the only power to allow claims against counties is lodged in the board of supervisors by section 10, art. 10, of the Constitution; (3) because the provision making the county liable is not covered by the title of the act.

The act in question amends a single section of the original act, which was passed in 1862, and was entitled "An act for the reorganization of the military forces of the State of Michigan." 1 How. Stat. § 868 *et seq.* The section amended, as originally passed, provided the compensation to be paid to the members of the militia. 1 How. Stat. § 915. It provided that, upon approval and certification of the commanding officers, the accounts of officers and men should be audited, allowed, and paid by the board of supervisors. The act in controversy is entitled "An act to amend   *   *   *   section No. 915,   *   *   *   relative to the compensation of State troops," and we think the title sufficient to cover all the provisions of the act. The amount of compensation, and source from which it is to come, are fairly within the title to the original act. The section (915) imposes the burden upon the county, and this section, as amended, does no more, except as to the method of allowance. We think it was unnecessary to make the title more specific.

The duty of preserving the peace is one resting upon the State. It may operate through its duly-constituted

agencies, counties and cities, both as to employment of the militia and its compensation. It has seen fit to confide the question of emergency to the locality, instead of leaving it to the State officers, where it would otherwise naturally belong; and it has imposed the duty of compensation upon the county. It has not seen fit to leave the question of compensation open to the danger of repudiation, by committing the question to boards of supervisors. The law fixes a compensation, and provides for payment by the State, upon allowance by the proper State officer. When paid, the liability of the county does not depend on the opinion of the board of supervisors, either as to the sufficiency of the requisition, the nature of the emergency, or the amount to be paid to the State. All of these things are now definitely fixed by law. It is a charge on behalf of the State, and can be contested only in the courts, if thought illegal or excessive. It is a right of the State to have a portion of the public revenue applied in discharge of a State obligation. If there is a constitutional right to have this submitted to the board of supervisors, it might as well be said that compensation for the care of the indigent insane or deaf and dumb is to be submitted to their discretion, or that *this claim* for unpaid State taxes should all go before the board of supervisors for allowance. It has never been supposed that the State must submit its claims to the boards of supervisors. To require it would be to set the county above the State. The provision of article 10, § 10, by which the board of supervisors has "exclusive power to prescribe and fix the compensation for all services rendered for and to adjust all claims against" the county, to the exclusion of appeal, has no application to such claims. The service of the militia is the service of the State, not the county, in the preservation of the peace of the State, not the county. Their compensation is a claim against the State, allowed and paid as such, and is a charge against certain revenues raised and disbursed in accordance to law in a certain locality. It was never

a constitutional right that such be submitted to the board, and apparently experience has shown that it was unwise to commit the matter to their discretion.

The writ should issue as prayed for the amount claimed, less the sum of $2,505.29 collection fees, and the amount of State taxes, and interest thereon, included in the Briggs claim, the amount of which we have not on this record the means of determining. If counsel cannot stipulate this amount, a reference may be necessary to determine the same, before the writ shall issue. Neither party should recover costs.

The other Justices concurred.